UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY MACINTOSH,

        Petitioner,

                                                Case No. 06-15647

v.                                             Honorable David M. Lawson

SUSAN DAVIS,

        Respondent.
_____/

## **OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Jeffrey MacIntosh, a thirty-six-year-old developmentally disabled male, was convicted by an Oakland County, Michigan jury of first-degree, premeditated murder and sentenced to prison for the rest of his life. He has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 alleging that his confession was improperly obtained; the trial court should not have allowed evidence of a prior, unrelated assault; and the State failed to present sufficient evidence of premeditation. The Michigan appellate courts rejected each of these claims. This Court finds that those decisions are not contrary to or an unreasonable application of federal law as determined by the Supreme Court. Therefore, the petition for a writ of habeas corpus will be denied.

I.

The petitioner was befriended by the Watson family, who lived in Huntington Woods, Michigan. The patriarch of the family, James Watson, who was sixty-seven years old and suffered from short-term memory loss, was found stabbed to death in the family home on February 24, 2003. The prosecution's theory of the case was that the petitioner stabbed Watson in the back with a knife from the kitchen in an act of revenge because of rejection by James Watson's wife and daughters.

The petitioner had been dating Watson's daughter Michelle, who also suffered from mild mental retardation. During their relationship, the Watson family, including James Watson's wife Annette and their other daughter Kelly, befriended the petitioner. Annette knew that the petitioner was not close to his own family, so she included him in family events and treated him as part of her family. After the petitioner stopped dating Michelle, the two remained roommates in a house the Watsons owned and the Watson family maintained its relationship with him. The petitioner's and Michelle's house was not far from Mr. and Mrs. Watson's home in Huntington Woods. The petitioner did chores for the Watsons in lieu of paying rent.

During the time leading up to the murder, the petitioner's relationship with the Watson family began to deteriorate. He became jealous when he thought Michelle had a boyfriend and asked Kelly to intervene with Michelle on his behalf. The petitioner also began to behave inappropriately with Annette when he misinterpreted her kindness as sexual interest. The petitioner made harassing telephone calls to Kelly after she excluded him from participating in giving a Valentine's Day card and gift to Mr. and Mrs. Watson in February 2003. From February 22 through 24, 2003, the petitioner left dozens of messages on Kelly's answering machine. This behavior caused both Annette and Kelly Watson to speak harshly with the petitioner the morning of February 24, 2003, in an effort to get him to stop his offensive conduct. They told the petitioner that they would call the police if he did not stop harassing Kelly. They testified that they never had spoken to him in this manner before this occasion.

During the same time frame, the petitioner visited Shirley Martin, who worked at a local market and with whom he had spoken daily about his relationship with his ex-girlfriend's family in the months prior to February 2003. The petitioner told Martin that Michelle's father had "old-

timer's disease." Martin testified that over the course of several weeks, the petitioner asked her the same question thirty to fifty times: if a person with "old-timer's disease" got hurt, would he remember how he got hurt and who hurt him? The petitioner talked to Martin a few days before the murder and he asked her the same question.

On the day of the murder, Annette Watson left home for work and left James at home still sleeping. In addition to short-term memory loss, James Watson also suffered from emphysema, which made him unable to engage in strenuous physical activity. James had a habit of placing the newspaper on the living room floor and reading it while sitting in his chair, leaning over the paper. Annette Watson testified that James had a good relationship with the petitioner and would have let him into the house. When Annette returned from work, she found her husband on the living room floor on his stomach with a knife sticking out of his back. She recognized the knife as one from her butcher block in the kitchen. In the kitchen, she saw a large butcher knife on the floor. There was no evidence of forced entry or looting. A photograph of the petitioner, Michelle, and the Watson grandchildren was discovered on the fireplace mantel cut in half, with Michelle separated from the petitioner.

Watson was pronounced dead on the scene. The county medical examiner testified that the stab wound to the back damaged the left lung and punctured the left main pulmonary artery, causing death. The knife was plunged seven inches into Watson's back. The knife had a single steel edge blade measuring eight inches in length and slightly less than one inch in width. The medical examiner testified that the direction of the stab wound was consistent with Watson sitting in a chair, leaning over, and an assailant stabbing him in the back from behind.

Police Lieutenant Nicholas Armold of the Huntington Woods Public Safety Department arrested the petitioner shortly before 9:00 p.m. on February 24, 2003 after Annette and Kelly named him as a person of interest. He interviewed the petitioner along with a Huntington Woods detective Livingston and Hazel Park police officer Ray Donofrio beginning at approximately 10:15 p.m. that evening. Armold testified at a pretrial hearing challenging the confession that the petitioner seemed coherent, responsive, and did not appear to be under the influence of any drugs or alcohol. Livingston read the petitioner his *Miranda* rights from an advice of rights form. Armold testified that the petitioner agreed to waive those rights in response to specific questions as to each right he was agreeing to waive. Livingston confirmed the waiver by asking: "Okay. I wanna make sure of this. This is waiving your rights. You're waiving these rights and you're going to talk to us, correct?" Hrg. Tr., Nov. 26, 2003, at 54. Livingston also said: "Okay, you're waiving your right to talk to a lawyer before talking to us, correct? So we can talk?" *Ibid.* Armold testified that the petitioner answered in the affirmative and initialed an advice of rights form for each right he waived. However, the petitioner's signed form was lost and never made part of the record. The interview was videotaped, but the parties subsequently learned that the recording device worked only intermittently due to a faulty motion detector.

When asked about his activities on that day, the petitioner initially stated that he had spent the day submitting job applications. He later admitted going to the Watson's house, shoveling the driveway, and then returning home. The petitioner also described his encounters with Annette and Kelly and expressed his concern that he would no longer be accepted as part of the Watson family because of his behavior. He then confessed to "hurting Jim" and explained that he had "stuck" him with a knife. Trial Tr., vol. II, Dec. 9, 2003, at 67. He said that he was inside the Watson's home

talking with James Watson; at some point, went into the kitchen, grabbed a knife from the butcher block, walked back into the living room where Watson was seated in a chair leaning over the newspaper, and stuck the knife into his back. The petitioner told the officers that he had done this to get back at Annette, Kelly, and Michelle. The petitioner wore gloves during the stabbing and was wearing gloves when he was arrested.

The police officers asked the petitioner whether he had thought about killing Mr. Watson prior to stabbing him, and the petitioner answered, "Nope." Trial Tr., vol. II, Dec. 9, 2003, at 100. The petitioner consistently denied having thought about killing Watson before the stabbing. Detective Armold testified that he could not tell whether the petitioner was being truthful on this point or not. When asked to write out a statement summarizing his confession, the petitioner asserted his rights to remain silent and asked for a lawyer; the interview ended.

At the pretrial hearing on the petitioner's motion to suppress the confession, David Niedermeier, Chief of the Hazel Park Police Department, testified about a 1995 encounter he had with the petitioner during which the petitioner waived his *Miranda* rights before confessing to another stabbing. Armold also testified about interviewing the petitioner regarding the Watson murder. The court denied the suppression motion.

Before trial, the state prosecutor moved to introduce evidence of the 1995 incident Niedermeier had described, in which the petitioner stabbed an acquaintance in the back with a small knife. The prosecutor sought to use the evidence to prove the petitioner's intent to kill Watson by arguing that the petitioner chose a larger knife in 2003 because his victim in the 1995 incident was able to struggle and escape when he used a small, dull knife. The prosecutor also wanted to offer evidence that the 1995 stabbing occurred shortly after the victim, with whom the petitioner had been

romantically involved, said that he wanted to cool things down in their relationship. The trial court granted the motion but limited the use of the evidence, instructing the jury that it could only consider it on the question of the petitioner's motive and intent to kill.

At trial, Leonard Dale Benyas, the victim of the 1995 stabbing incident, testified that after he told the petitioner he was no longer interested in him, the petitioner offered to give Benyas a back rub. During the back rub, the petitioner stabbed Benyas in the back three times. The petitioner and Benyas struggled and the petitioner attempted to slit Benyas' throat with the knife. Benyas testified that the attempt failed because the knife was dull. Benyas spent three days in the hospital due to these injuries.

Chief Niedermeier testified at trial about his interrogation of the petitioner in relation to the 1995 stabbing of Benyas. After being advised of his rights, Officer Niedermeier testified that the petitioner indicated his understanding of each right by initialing the form by that right before waiving his *Miranda* rights. He then admitted that he stabbed Benyas. Niedermeier also testified to his conclusion that the 1995 incident was probably a spontaneous act on the petitioner's part.

At the close of the state's case, defense counsel moved to dismiss the first-degree murder charge for want of evidence on the elements of premeditation and deliberation. The court denied the motion. The jury convicted the petitioner of first-degree premeditated murder, and the trial court sentenced him to life in prison without parole. The state court of appeals affirmed the conviction on direct appeal, No. 260187, 2006 WL 1626650 (Mich. Ct. App. Jun. 13, 2006), and the state supreme court denied leave to appeal, *People v. MacIntosh*, 477 Mich. 917 (2006).

The petitioner timely filed a petition for a writ of habeas corpus raising the following issues, all of which had been raised in the state appellate courts:

> I. Was it in error for the trial court to rule that the statement to police made by the defendant-appellant while he was in police custody and without the benefit of counsel was voluntarily given, and therefore admissible at trial
>
> II. Was it error for the trial court to grant the [State]'s motion to admit evidence of other crimes, wrongs, or acts pursuant to [Michigan Rule of Evidence] 404(b) where the proffered evidence was factually distinct in nature from the facts of this instant case and much more unfairly prejudicial than probative of guilt
>
> III. Was it in error for the trial court to deny the defendant-appellant's motion for a directed verdict of first-degree premeditated murder where the People failed to establish a prima facie case on the elements of premeditation and deliberation
>
> IV. Did the insufficient evidence presented during the defendant-appellant's trial, on the elements of premeditation and deliberation, to support the jury's verdict of guilty of first degree premeditated murder constitute a denial of the due process of law guaranteed by the Fifth Amendment to the United States Constitution

Pet., app. A, at 1. The respondent filed a response asserting that the state court's adjudication of the first, third, and fourth claims did not involve an unreasonable application of clearly established Supreme Court precedent, and that the second claim is not cognizable on habeas because it asserts an error of state law.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)

& (2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .

> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11; *see also Knowles v. Mirzayance*, __ U.S. __, __, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme "Court has held on numerous occasions that it is not '"an unreasonable application of clearly established Federal law"' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

A.

The petitioner first claims that his conviction is unconstitutional because the State used a confession that was 1) involuntary because it was coerced by promises that he could go home after giving a statement, and 2) unknowing and unintelligent because he is mentally retarded and incapable of making a voluntary waiver of his *Miranda* rights. A criminal defendant "may waive effectuation" of the rights conveyed in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The inquiry into whether a *Miranda* waiver is valid has "two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Edwards v. Arizona,* 451 U.S. 477, 482 (1981); *Brewer v. Williams*, 430 U.S. 387, 404 (1977)).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979), and *North Carolina v. Butler*, 441 U.S. 369, 374-375 (1979)).

The Supreme Court has plainly held, however, that unless a confession is the product of coercive police activity, the confession should not be found to be involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"). At the pretrial suppression hearing, defense counsel argued that the police coerced the waiver by promising the petitioner that he could go home after giving them a statement. The trial court found that no such promise was made.

The Court finds that this determination was reasonable in light of the facts adduced in the state record. It is not clearly erroneous and therefore presumed correct. 28 U.S.C. § 2254(e)(1); *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Officer Armold testified that before the petitioner was read his rights he asked why he was there and whether he could go home. The police did not tell him why he was there and he was told that he could not go home. Instead, detective Livingston said that the police were investigating an incident that happened earlier in the day and that the police were not sure if he was going to be able to go home, and it would depend upon the outcome of the investigation. This testimony doers not establish coercive conduct by the police.

Nor does the record support the claim that the petitioner's waiver of his *Miranda* rights was uninformed. When examining the validity of a *Miranda* waiver, the main question is not whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment Privilege," but rather whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

Detective Livingston advised the petitioner of each of his *Miranda* rights by reading from an advice of rights form. Livingston then asked the petitioner if he understood each right, if he would agree to waive his right to talk to a lawyer before questioning, and if he would agree to waive his right to remain silent and answer any questions asked by the police. The petitioner initially stated that he did not understand why he was there and asked if he could go home. After being told the police were investigating an incident that happened earlier in the day and that they weren't sure whether he'd be able to go home, he was again asked the three waiver questions. He answered all waiver questions in the affirmative.

The trial court determined that the gaps in the video and the missing advice of rights form signed by the petitioner were not significant to the ultimate determination that the waiver was voluntary, knowing, and intelligent in light of the testimony of officers Niedermeier and Armold. The fact that the petitioner had been diagnosed as mildly mentally retarded is undisputed. However, a criminal defendant's diminished mental capability is but one factor for a court to consider in determining the voluntary nature of a waiver and is not dispositive. *See Garner v. Mitchell*, 557 F.3d 257, 264 (6th Cir. 2009). It is undisputed that Livingston carefully read the petitioner his *Miranda* rights and the petitioner affirmed his understanding of each right and affirmed that he was

waiving each right. He was not under the influence of drugs or alcohol. The interview lasted approximately one hour. After the waiver, the petitioner clearly and accurately explained the circumstances surrounding his stabbing of Mr. Watson. The trial court and the appellate court emphasized the petitioner's previous experience with the criminal justice system. *See id.* at 265 (citing *Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004). Officer Niedermeier testified that the petitioner expressed his understanding and waived his *Miranda* rights in connection with the 1995 stabbing. Later in the 2002 interview, the petitioner actually exercised his right to remain silent and asserted his right to an attorney after making the inculpatory statements and learning that he would not be able to go home. *See Spring,* 479 U.S. at 574 (holding that a suspect's waiver is valid if the suspect knew he could discontinue talking to police and have attorney present).

The state courts' determination that the petitioner's waiver of his *Miranda* rights was voluntary, knowing, and intelligent under the totality of the circumstances is not contrary to or an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts. The petitioner therefore is not entitled to habeas relief on this claim.

B.

The petitioner argued in the state proceedings that the trial court erred in admitting evidence regarding the 1995 stabbing incident. The Michigan Court of Appeals upheld the trial court's decision to admit the evidence under the state rule of evidence, stating:

> The circumstances leading up to the October 27, 1995, stabbing were sufficiently similar to the circumstances leading up to the stabbing of James [Watson]. In each case, defendant had a close relationship with the victim. When defendant was threatened with the loss of the relationship, defendant reacted by stabbing each victim in the back. . . . It can be reasonably inferred that the stabbing of James on February 24, 2003, was motivated by the threat of defendant not being able to interact with the Watson family.

*People v. MacIntosh*, No. 260187, 2006 WL 1626650, at *3 (Mich. Ct. App. Jun. 13, 2006). The court found that the evidence had been admitted for a proper purpose, i.e., to establish motive and intent; that it was relevant; and that it was more probative than prejudicial in light of the trial court's limiting instruction.

"Habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994). The Sixth Circuit Court of Appeals has explained that:

> "[E]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)); *see also Spencer v. Texas*, 385 U.S. 554, 563-64 (1967).

*Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (alterations in original). The Supreme Court has declined to hold that admission of "other acts" evidence is so extremely unfair that it violates fundamental precepts of justice. *Cf. Dowling v. United States*, 493 U.S. 342, 352-53 (1990). Such matters are more appropriately addressed in codes of evidence than under the Due Process Clause. *Id.* at 352.

The Sixth Circuit has repeatedly held that only "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Although the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. Therefore, "[t]here is no clearly established Supreme Court precedent which

holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512. Consequently, there is no Supreme Court precedent that the state court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1). *Bugh*, 329 F.3d at 513.

Nor has the Supreme Court ever held that evidence tending to prove criminal propensity violates due process. *Estelle v. Gamble*, 502 U.S. 62, 75 n.5 (1991). In fact, such evidence is allowed in sexual assault cases under the Federal Rules of Evidence. *See* Fed. R. Evid. 413.

The Court therefore cannot say that admission of the petitioner's past misdeed violated any of his federal rights.

C.

In his last two arguments, the petitioner contends that the trial court erred in denying his motion for a directed verdict because there was insufficient evidence of deliberation and premeditation to support his first-degree murder conviction. The Michigan Court of Appeals rejected this argument as follows:

> First, defendant's premeditation was shown by previous relationship with James and the Watson family. [*See People v. Plummer*, 229 Mich. App. 293, 300, 581 N.W.2d 753 (1998)]. The prosecution presented evidence that defendant was attracted to Annette and that defendant contemplated hurting James more than six months prior to the killing. Shirley Martin testified that defendant indicated to her that he was "physically attracted" to Annette and that "she [Annette] likes me in that way." When Martin inquired about James, defendant stated that he had "old-timer's disease." Martin testified that defendant came into the store on "30 to 50" separate occasions and repeatedly ask[ed] her if "a person with old-timer's disease got hurt would they remember how they got hurt?" and "if a person with old-timer's disease got hurt would they know, would they remember who hurt them?" Furthermore, Annette testified to numerous instances leading up to the killing where she rejected defendant's sexual advances toward her. Defendant followed each rejection with anger at the Watson family.

> Second, defendant's premeditation was shown by his actions before and after the crime. *Plummer, supra* at 300. The evidence revealed that prior to the February 24, 2003, stabbing defendant was becoming increasingly angry and agitated at the possibility of not being part of the Watson family. Annette and Kelly Watson testified to numerous inappropriate messages from defendant where he indicated that he was angry that he was not being treated as part of the family. Moreover, on the morning of the stabbing, Annette told defendant that she would call the police if he did not leave "her children" alone and that Annette was unsure if defendant's relationship with the Watson family could continue. It could reasonably be inferred that on February 24, 2003, defendant was angry at Annette for attempting to end defendant's relationship with the family and that defendant retaliated by stabbing James. This conclusion is corroborated by (1) the severed picture found on the mantle where defendant was "cut" apart from the rest of the family and (2) defendant's confession where he stated that he stabbed James because he was mad at Annette and Kelly for blaming him for things he did not do and that the stabbing was his way of "getting back" at them.
>
> Finally, defendant's premeditation was established by the circumstances of the killing itself. *Plummer, supra* at 300. Defendant indicated in his confession that he spoke with James briefly prior to walking into the kitchen, which was 12 to 15 feet away from the living room, and selecting an eight-inch knife from the butcher block. Defendant, who was wearing gloves at the time, approached James from behind and stabbed him in the back. Based on the medical examiner's testimony, there was no evidence suggesting that defendant acted in self-defense or that James was aware of defendant's approach from behind. The fatal wound was a single, seven-inch deep stab wound to the back. Further, Williams testified that when defendant was placed in his cell following the police interview, defendant was "agitated" and repeatedly asked if the police w[]ere able to obtain "DNA" evidence from the gloves that defendant was wearing or the knife.
>
> Viewing the foregoing evidence in a light most favorable to the prosecution, we conclude that the prosecution presented sufficient evidence to prove the elements of first-degree premeditated murder beyond a reasonable doubt, and the trial court did not err in denying defendant's motion for a directed verdict.

*People v. MacIntosh*, No. 260187, 2006 WL 1626650 *5-*6 (Mich. Ct. App. Jun. 13, 2006).

The Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt." *Fiore v. White,* 531 U.S. 225, 228-29 (2001) (citing *Jackson v. Virginia,* 443 U.S. 307, 316 (1979)); *In re Winship,* 397 U.S. 358, 364 (1970). Sufficient evidence supports a conviction if, "after viewing the evidence in the light most favorable

to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

Based on the evidence presented at trial, the Court finds that a rational juror could have inferred an intent to kill, premeditation, and deliberation for the reasons given by the Michigan Court of Appeals and from several additional facts. The Court cannot accept the petitioner's argument that the only inference to be drawn from his questions to Shirley Martin about "old-timer's disease" is that he only intended to hurt Watson. It could also be inferred that the petitioner wanted to find out what would happen if he were not successful in killing Watson as intended. This inference is supported by the petitioner's earlier experience of stabbing Benyas only to the point of injury. The fact that the petitioner chose to use a much larger knife when he attacked Watson than the one he used on Benyas also invites the inference that he intended to kill Watson. Similarly, an intent to kill can be inferred from the fact that the petitioner stabbed Watson in the back rather than in an appendage and plunged the eight-inch knife seven inches deep into Mr. Watson. Finally, the petitioner emphasizes that he only confessed to "hurting" Watson. A rational fact finder could infer that the petitioner, who knew enough to attempt to deceive investigators about his involvement, purposely used the word "hurt" to minimize his actions.

Viewed in the light most favorable to the prosecution, there was ample evidence from which to infer premeditation and intent beyond a reasonable doubt. The state courts' decision that the evidence was constitutionally sufficient was neither contrary to nor based upon an unreasonable application of federal law.

III.

The petitioner has not established that he is presently in custody in violation of the Constitution or the law of the United States.

Accordingly, it is **ORDERED** that his petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated: March 22, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 22, 2010.

s/Teresa Scott-Feijoo  
TERESA SCOTT-FEIJOO